Case No.: 13-35154

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CHET MICHAEL WILSON,
Plaintiff-Appellant,

v.

JOAN COPPERWHEAT, Director of Lane Co. Parole and Probation, et al.,
Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

**REPLACEMENT OPENING BRIEF OF PLAINTIFF-APPELLANT**

UNIVERSITY OF ST. THOMAS
SCHOOL OF LAW
APPELLATE CLINIC

Lindsay C. Lien
Colin Seaborg
*Certified Law Student
Representatives*

Gregory C. Sisk
*Supervising Attorney*

1000 LaSalle Ave., MSL 400
Minneapolis, MN 55403-2015
651-962-4923

UNIVERSITY OF ARKANSAS
FEDERAL APPELLATE
LITIGATION PROJECT

Thomas Christoph Keller
Britta Stamps
*Certified Law Student
Representatives*

Dustin E. Buehler
*Supervising Attorney*

Robert A. Leflar Law Center
Fayetteville, AR 72701
479-575-6006

Pro Bono Counsel for Plaintiff-Appellant Chet Michael Wilson

# TABLE OF CONTENTS

INTRODUCTION ...................................................................1

JURISDICTIONAL STATEMENT ......................................2

ISSUES PRESENTED FOR REVIEW ..................................4

CONSTITUTIONAL PROVISIONS, STATUTES AND
      REGULATIONS ............................................................5

STATEMENT OF THE CASE...............................................5

    A.    Wilson Released from Prison But Returned to
          Confinement Upon Revocation of Release .........................6

          1.    Wilson Released from Prison on Transitional
                Leave ...........................................................6

          2.    Wilson Arrested and Returned to Confinement
                Without Notice.................................................7

          3.    Wilson Denied Timely Misconduct Report and
                Hearing.........................................................8

          4.    Wilson Continued to Seek Answers and a Return
                to Transitional Release..................................10

          5.    Hearing Officer Dismissed the Misconduct Charge
                Against Wilson............................................11

          6.    Wilson Denied Release Even After Favorable
                Hearing Decision.........................................12

          7.    Wilson Persisted in Inquiries as Other Prison
                Officials Expressed Confusion ..................14

          8.    Re-Submitted Misconduct Charge is Dismissed,
                and Wilson Gives Notice of Intent to File a Habeas
                Petition .......................................................15

9.     Wilson Released from Prison.......................................17

B.     Section 1983 Proceedings .................................................18

1.     Wilson Filed Section 1983 Civil Rights Suit............................18

2.     District Court Dismissed Action on Statute of Limitations Grounds ...............................................19

3.     Appeal to This Court.......................................20

SUMMARY OF THE ARGUMENT ......................................21

ARGUMENT ...........................................................23

I.     The District Court Erred in Dismissing Wilson's § 1983 Complaint as Untimely Under the Statute of Limitations Because *Heck v. Humphrey* Prevented the Accrual of Wilson's Civil Rights Claim During the Period of Continued Confinement .........................................................23

A.     Although Wilson's Lawsuit is Subject to Oregon's Two-Year Personal Injury Statute of Limitations, Federal Law Governs the Accrual of a § 1983 Action Challenging the Lawfulness of Confinement .................................24

B.     Because Wilson's Allegations Undermine the Validity of His Renewed Confinement, *Heck v. Humphrey* Barred Accrual of the § 1983 Claim During the Period of Confinement .........................................................25

1.     *Heck v. Humphrey* Requires a Person Challenging the Lawfulness of Confinement to Obtain a Favorable Result Through State Remedies and Federal Habeas Before a § 1983 Claim Becomes Cognizable ...............................................25

2.     The *Heck* Bar on § 1983 Accrual Extends to Claims Challenging the Validity of Prison Discipline That Extends the Duration of Confinement.......................................27

C. Because Wilson's Due Process Claims Directly Challenge the Validity of His Confinement and Revocation of Transitional Release, the *Heck* Bar Precluded Accrual of His Civil Rights Claim Until He Succeeded in Obtaining Release from Prison ......................................28

D. Alternatively, Because State Administrative Remedies Must be Exhausted Under the Prison Litigation Reform Act, the Statute of Limitations for Wilson's § 1983 Action was Tolled at Least Until the Dismissal of the Misconduct Charges at the Second Hearing ......................................31

II. Upon His Release From Prison After Diligently Challenging the Revocation of Transitional Release, Wilson's § 1983 Civil Rights Due Process Claim Became Cognizable and Now May Proceed......................................34

A. Having Been Released From Prison After Successfully Obtaining Dismissal of Misconduct Charges, Wilson May Pursue His § 1983 Claim Under the Favorable-Termination Rule of *Heck* ......................................34

B. In the Alternative, Under *Nonnette v. Small*, Wilson May Now Pursue a § 1983 Civil Rights Claim Because His Release From Prison Mooted Any Petition for Habeas ......................................38

CONCLUSION ......................................44

STATEMENT OF RELATED CASES ......................................45

CERTIFICATE OF COMPLIANCE WITH RULE 32 TYPE-VOLUME, TYPEFACE AND TYPE STYLE REQUIREMENTS ......................................46

PROOF OF SERVICE ......................................47

ADDENDUM:

CONSTITUTIONAL PROVISION ........................................... ADDENDUM — 1

    Amendment XIV, Section 1 ............................................. ADDENDUM — 1

STATUTES ...................................................................... ADDENDUM — 2

    Writ of Habeas Corpus, State Custody,
        28 U.S.C. § 2254(a) to (c) ...................................... ADDENDUM — 2

    Civil Rights Act, 42 U.S.C. § 1983 ................................. ADDENDUM — 3

    Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ........ ADDENDUM — 3

    Oregon Revised Statutes § 12.110(1) ............................... ADDENDUM — 3

OREGON ADMINISTRATIVE REGULATIONS .................... ADDENDUM — 4

    291-062-0100 ..................................................................... ADDENDUM — 4

    291-062-0110 ..................................................................... ADDENDUM — 4

    291-062-0120 ..................................................................... ADDENDUM — 5

    291-062-0150 ..................................................................... ADDENDUM — 6

    291-063-0036 ..................................................................... ADDENDUM — 8

    291-105-0021 ..................................................................... ADDENDUM — 9

# TABLE OF AUTHORITIES

## Cases

*Bagley v. CMC Real Estate Corp.,* 923 F.2d 758 (9th Cir. 1991) ..........................24

*Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2005) ................................................. 19, 32

*Butterfield v. Bail*, 120 F.3d 1023 (9th Cir. 1997)....................................................31

*Carr v. O'Leary*, 167 F.3d 1124 (7th Cir. 1999) ................................................. 40-41

*Cole v. Doe 1*, 387 F. Supp. 2d 1084 (N.D. Cal. 2005)..........................................39

*Dible v. Scholl*, 410 F. Supp. 2d 807 (N.D. Iowa 2006)................................... 27, 41

*Edwards v. Balisok*, 520 U.S. 641 (1997)..................................................... 27-28, 34

*Elliot v. United States*, 572 F.2d 238 (9th Cir. 1978) ............................................31

*Ellis v. City of San Diego*, 176 F.3d 1183 (9th Cir. 1999).........................................3

*Guerrero v. Gates*, 442 F.3d 697 (9th Cir. 2006) ............................................ 41, 42

*Hamilton v. Brown*, 630 F.3d 889 (9th Cir. 2011)....................................................23

*Harden v. Pataki*, 320 F.3d 1289 (11th Cir. 2003)..................................................41

*Heck v. Humphrey*, 512 U.S. 477 (1994)......................................................... *passim*

*Jenkins v. Haubert*, 179 F.3d 19 (2d Cir. 1999) .....................................................40

*Morrissey v. Brewer*, 408 U.S. 471 (1972)....................................................... 36-37

*Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002) .................... 1, 5, 20, 22, 28, 38-43

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592 (6th Cir. 2007)..................................................................................................41

*Preiser v. Rodriguez*, 411 U.S. 475 (1973)...............................................................26

*Pride v. Correa*, 719 F.3d 1130 (9th Cir. 2013) ........................................5

*Rosales-Martinez v. Palmer*, 753 F.3d 890 (9th Cir. 2014) ............................ 24, 25

*Sain v. City of Bend,* 309 F.3d 1134 (9th Cir. 2002) ...............................24

*Silva v. Andemariam*, No. C13-1182-JLR, 2014 WL 294528 (W.D. Wash. 2014) ................................................................39

*Spencer v. Kemna*, 523 U.S. 1 (1998)............................................ 39, 40

*Wallace v. Kato,* 549 U.S. 384 (2006) ..................................................24

*Wilhelm v. Rotman*, 680 F.3d 1113 (9th Cir. 2012)..................................5

*Wilkinson v. Dotson*, 544 U.S. 74 (2005) ...........................................27

*Wilson v. Garcia*, 471 U.S. 261 (1985) ...............................................24

*Wilson v. Johnson*, 535 F.3d 262 (4th Cir. 2008) ........................... 41, 43

*Young v. Harper*, 520 U.S. 143 (1997) ................................................36

## Constitutional Provisions

U.S. Const., amend XIV ................................................................. *passim*

## Statutes

28 U.S.C. § 1291 ............................................................................3

28 U.S.C. § 1331 ............................................................................2

28 U.S.C. § 1915A..........................................................................19

28 U.S.C. § 2254 ...................................................................... 21, 25

42 U.S.C. § 1983 .......................................................................... *passim*

42 U.S.C. § 1997e(a)........................................................32

Or. Rev. Stat. § 12.110(1) .............................................24

Or. Rev. Stat. § 144.343(1) ...........................................35

**Regulations and Rules**

Oregon Administrative Rules (OARs):

    255-075-0005(1) .....................................................35

    291-062-0100(3) .......................................................6

    291-062-0110(1) .......................................................6

    291-062-0110(4) .......................................................6

    291-062-0120(1)(b) ...................................................6

    291-062-0150............................................................35

    291-063-0036............................................................35

    291-063-0036(2) ...................................... 8, 12-13, 35

    291-063-0036(3) ..................... 9, 12-13, 16, 32, 35, 36, 37

    291-105-0021(5)(b) ...................................................9

Federal Rules of Appellate Procedure:

    Rule 4(c)(1)..............................................................2

    Rule 32(a)(5)...........................................................46

    Rule 32(a)(6)...........................................................46

    Rule 32(a)(7)(B) ......................................................46

Rule 32(a)(7)(B)(ii) ........................................................46

Ninth Circuit Rule 28-2.7 ................................................5

**Law Journals**

Note, *Defining the Reach of* Heck v. Humphrey*: Should the*
*Favorable Termination Rule Apply to Individuals Who Lack*
*Access to Habeas Corpus?*, 121 Harv. L. Rev. 868 (2008) .........................39

## INTRODUCTION

When his transitional release from prison was improperly revoked without a prompt hearing and based on false evidence, Chet Michael Wilson did exactly what the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994), and this Court in *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002), have told state prisoners to do. Rather than attempt an end-run around state remedies that are prerequisites to the eventual filing of a federal habeas petition, he diligently pursued every avenue to reverse the false misconduct charge that resulted in his return to confinement.

Wilson was so persistent in gathering evidence to refute the misconduct charge, insisting on a hearing, achieving a dismissal of the misconduct charge at the hearing, and identifying responsible prison officials to seek relief that he was rebuked in writing for failing to appreciate that he had "exhausted all of [his] possible remedies with the department on this matter" and was told that "[a]ny further communications with the department about [his] instatement to or failure from transitional leave will receive no response."  ER 49.

And yet Wilson was not dissuaded.  Having obtained a favorable outcome at a hearing with dismissal of the charge of misconduct, ER 36, he persevered and obtained another dismissal of the re-submitted charge at a second hearing, ER 42. Finally, he provided notice to Oregon's Solicitor General of his intent to file a habeas petition in state court.  ER 20.  Suddenly, the Oregon Department of

Corrections set aside its previous declaration that Wilson must remain in prison for another twelve months, ER 45, and ordered his immediate release, ER 20.

Upon release from confinement, the "*Heck* bar" — which precludes using a civil rights action under 42 U.S.C. § 1983 to avoid exhausting state remedies before seeking federal habeas relief — was lifted. Accordingly, Wilson's § 1983 action for damages began to accrue and the statute of limitations clock began to run. Wilson timely filed this action within two years of his release. ER 19-20.

## JURISDICTIONAL STATEMENT

The District Court properly exercised federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff-appellant Chet Michael Wilson's civil rights action under 42 U.S.C. § 1983 alleges due process violations by the revocation of his early release based on false evidence and without a prompt hearing. *See* ER 13-17.

On January 17, 2013, the District Court ordered the dismissal of Wilson's complaint, ER 13-17, and entered a final judgment, ER 12. On February 15, 2013, Wilson mailed a notice of appeal through the Oregon State Penitentiary mailing system. ER 9. Under Rule 4(c)(1) of the Federal Rules of Appellate Procedure, "if an inmate confined in an institution files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing." Pursuant to this rule, Wilson certified

that he mailed the notice of appeal through the prison mailing system to the United States Court of Appeals for the Ninth Circuit on February 15, 2013 — which was twenty-nine (29) days after the District Court had dismissed his 42 U.S.C. § 1983 claims. *See* ER 9. In *Ellis v. City of San Diego*, 176 F.3d 1183, 1188 (9th Cir. 1999), where a prisoner had timely sent the notice of appeal through the prison mail system to the Court of Appeals, this Court ruled as a matter of law that, "even if for some reason [the prisoner's] filing with the court had been deficient, his notice of appeal was deemed filed when he gave it to the prison authorities [on a date within 30 days of judgment]." Accordingly, Wilson's appeal was timely filed.

This Court has jurisdiction under 28 U.S.C. § 1291.

# ISSUES PRESENTED FOR REVIEW

The District Court dismissed as untimely Chet Michael Wilson's civil rights action under 42 U.S.C. § 1983 alleging due process violations in the revocation of his transitional leave and return to prison confinement. The District Court ruled that the claim had accrued some four months before final dismissal of disciplinary charges at a second hearing and while Wilson remained incarcerated. Wilson's § 1983 action was filed within two years of his release from prison.

The District Court erred because:

1. Wilson's due process claims arising from the revocation of his transitional leave from prison expressly call into question the lawfulness of his prolonged confinement, so that under *Heck v. Humphrey*, 512 U.S. 477 (1994), the § 1983 action could not accrue until after favorable termination of state remedies or federal habeas proceedings — that is, not until the revocation was overturned and Wilson was released.

2. Wilson's § 1983 civil rights suit became cognizable upon his release from prison after he had successfully challenged the lawfulness of his confinement by twice obtaining dismissal of misconduct charges after prison disciplinary hearings and providing notice that he intended to file a habeas petition, which was closely followed by the prison ordering his immediate release.

3. Alternatively, under *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002), the *Heck* bar on Wilson's § 1983 action was lifted upon his release from prison because the favorable termination requirement does not apply when a person is no longer incarcerated and thus is unable to pursue federal habeas relief, as long as the person diligently challenged the validity of his confinement before release.

## CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS

Pursuant to Circuit Rule 28-2.7, pertinent constitutional provisions, statutes, and regulations are included in the Addendum to this brief.

## STATEMENT OF THE CASE

This Court reviews dismissal of a complaint *de novo*, and "all factual allegations in [a plaintiff's] complaint are taken as true and all reasonable inferences are drawn in his favor." *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). Moreover, "where the petitioner is *pro se*, particularly in civil rights cases, [courts should] construe the pleadings liberally and . . . afford the petitioner the benefit of any doubt." *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (internal quotation omitted). Accordingly, the factual statements below are based on Chet Michael Wilson's pro se verified complaint, including several prison documents and Wilson's hand-written notations on those documents. *See* ER 18-50.

**A. Wilson Released from Prison But Returned to Confinement Upon Revocation of Release**

**1. Wilson Released from Prison on Transitional Leave**

Serving a term in Oregon state prison for a non-violent controlled substance offense, Chet Michael Wilson participated in Oregon's "Alternative Incarceration Program" (AIP). The AIP includes both "a structured institution program and a period of structured short-term transitional leave." Oregon Administrative Rules (OAR) 291-062-0120(1)(b).[1] The AIP "promote[s] inmate rehabilitation during incarceration and reduce[s] the risk of continuing criminal conduct when the inmate is returned to the community," OAR 291-062-0100(3), through "intensive interventions, rigorous personal responsibility and accountability, physical labor, and service to the community," OAR 291-062-0110(1).

As an integral part of Oregon's program, Wilson was released from prison on "Transitional Leave." *See* ER 40-41. Under the AIP, transitional leave "allows an inmate opportunity to secure appropriate transitional support when necessary for successful reintegration into the community." OAR 291-062-0110(4).

---

[1]     Pertinent provisions in the Oregon Administrative Rules or OARs are included in the Addendum to this brief and are also available online at http://sos.oregon.gov/archives/Pages/oregon_administrative_rules.aspx.

Wilson returned to his home community of Florence, Oregon, initially taking up residence with his father, renewing his relationships with his girlfriend and their children, and finding productive work. *See* ER 43, 45.

Needing occasionally to stay at another location for work-related reasons, Wilson had, on at least seven prior occasions, received permission from Lane County Parole Officer Adam Johnson to stay at a residence other than that of his father or girlfriend. ER 43. Johnson had told him that, as long as he was doing something "productive," Wilson need only call and leave him a telephone message, without expecting Johnson to call him back. ER 43. Wanting to confirm this practice, ER 43, Wilson prepared a document for Johnson's approval, providing that Wilson could stay "where he wants . . . as long as he calls and leave[s] me a message." ER 36. Officer Johnson agreed, added the phrase "3 days a week with approval," and signed the document. ER 36.

### 2. Wilson Arrested and Returned to Confinement Without Notice

Less than two months after release, on May 27, 2010, Wilson was surprised at a parole office meeting by police who arrested him for allegedly violating the terms of his transitional leave. ER 23, 39. Earlier that same day, Wilson had contacted the parole office well before a scheduled meeting, only to discover that the officer with whom he was to meet had cancelled her appointments in Florence for that day. ER 39. Wilson immediately telephoned Officer Johnson, explained

the cancellation, and asked if Johnson wanted to meet with Wilson that evening. ER 39. When he arrived for his meeting with Johnson that evening, Wilson was met by police, arrested, and returned to custody. ER 23, 39.

A document titled "Alternative Incarceration Findings and Recommendation," dated May 27, 2010, and later included in the administrative record, stated that "Wilson has frequented taverns, he has failed to report to his PO and he has changed residences without permission of the PO." ER 32. Nothing in the record indicates that Wilson was given any notice of this charge. Parole and correctional officers never provided the required "Notice of Rights/Decision About Rights" to Wilson or notified him of his right to a hearing. ER 23, 31.

### 3.    Wilson Denied Timely Misconduct Report and Hearing

Under OAR 291-063-0036(2), when a person is charged with violation of transitional leave, a misconduct report must be submitted by the supervising parole officer within "5 working days of the infraction."

No misconduct report was prepared until nearly a month later, on June 23, 2010, ER 35, and only after Wilson's attorney Larry Roloff had complained to the prison's transitional leave administration that they had yet to receive a report with "specific allegations for termination," ER 33. By the time a misconduct report was delivered to Wilson, he had been back in custody for nearly a month. ER 35.

The misconduct report recited that Parole Officer Johnson reported that Wilson had been staying at other residences and that Wilson "was not approved to reside anywhere other his father's and girlfriend's home." ER 35. The report did not acknowledge Johnson's signed approval for Wilson to stay "where he wants . . . as long as he calls and leave[s] me a message." ER 36. The report also charged that Wilson had admitted to entering a bar, which the rules defined as "a business or establishment where the primary purpose is the sale of alcoholic beverages or gambling." ER 35.

When a misconduct report is submitted, prison regulations state that "a hearing shall be conducted." OAR 291-063-0036(3). If the inmate is found in violation at the hearing, then he "may be subject to a revocation of the leave and be returned to a Department of Corrections facility." *Id.* A hearing regarding such a rule violation "shall be initiated as soon as practicable." OAR 291-105-0021(5)(b).

Although no hearing had been held — and consequently no finding that he was subject to revocation — Wilson was abruptly returned to custody in May. ER 23-24. And, as May slipped into June, and June passed into July, Wilson received no hearing. ER 23-24.

### 4. Wilson Continued to Seek Answers and a Return to Transitional Release

Throughout the summer, Wilson continually denied the alleged violations that were offered to justify revocation of the transitional leave and repeatedly sought answers for his continued confinement:

On June 14, 2010, Wilson's attorney, Larry Roloff, sent a letter to Ginger Martin, Assistant Director of Transitional Leave Services requesting a hearing or appeal about the termination of Wilson's transitional leave. ER 33. Roloff stated that, having learned about "certain allegations" in prison conversations, Wilson was addressing the charges in letters and other documents submitted along with the lawyer's letter. ER 33.

Nearly one month later, on July 13, 2010, Assistant Director Martin denied Wilson's request to be returned to transitional leave, repeating the allegations that he had "entered into an establishment where alcohol was the primary source of revenue and failed to remain at an approved residence." ER 34. Martin did not conduct a hearing or otherwise give Wilson an opportunity to rebut the accusations and present evidence. *See* ER 34. Instead, Martin notified Wilson that she had "corroborate[d] all of the allegations made in the parole officer's report." ER 34.

On the following day, July 14, 2010, Wilson attempted to contact Martin, using a prison communications form to seek her assistance in arranging for a hearing in which Wilson could respond to the allegations in person and with

evidence.  ER 43.  Denise Taylor, Martin's administrative assistant, responded a week later, writing that "Ms. Martin does not have the authority to schedule hearings or order hearings officers to do hearings."  ER 43.

### 5. Hearing Officer Dismissed the Misconduct Charge Against Wilson

On August 5, 2010, nearly two-and-a-half months after Wilson's arrest and return to confinement, a disciplinary hearing was held by the Oregon Department of Corrections.  ER 36.  The hearing officer said he had postponed the hearing from July 2, 2010, believing additional investigation was necessary.  ER 36.

The hearing officer recorded the submission of evidence that "the 'bar' I/M Wilson was observed to be present at appears" to be a restaurant at which food sales were 80 percent of total sales.  ER 36.  The manager of the restaurant testified that Wilson had never been in the small bar inside the restaurant and never consumed alcohol.  ER 36.  As for the other establishment that Wilson visited, two employees testified that it was a family restaurant and that Wilson did not sit at the restaurant's bar or consume alcohol.  ER 36.

In addition, the hearing officer observed that a document was entered into evidence, signed by Parole Officer Johnson, that granted Wilson permission to stay "where he wants" for three days per week, as long as Wilson called and left a message for Johnson.  ER 36.

Accordingly, based on this evidence, the hearing officer dismissed the charge against Wilson of disobedience of transitional leave orders, without prejudice to the submission of a new misconduct report that provided "the correct charges and/or additional information necessary." ER 36.

### 6.     Wilson Denied Release Even After Favorable Hearing Decision

Expecting he would be released after the August 5, 2010, hearing, Wilson stayed in regular communication with correctional officers and employees and looked forward to rejoining his family in Florence, Oregon. ER 44-49.

Immediately after the disciplinary hearing and the dismissal of the charge, Wilson wrote to the Functional Unit Manager and to Scott Fritz, the Transition Service Manager, requesting that his release be expedited so he could attend his son's fourth birthday on August 29, 2010. ER 45-46.

Far from what Wilson expected, Fritz responded the following day that Wilson would not be released until some sixteen months later, on December 5, 2011. ER 45. The Oregon Department of Corrections now took the position that "[t]he misconduct dismissal has no bearing on your revocation." ER 45. Three days later, Fritz reiterated that prison officials he had contacted were now saying that the dismissal of the misconduct charge "is separate from the revocation," claiming that return to transitional release is "at the superintendent's discretion." ER 46. Neither Fritz nor any other prison official had acknowledged OAR 291-

063-0036(2) and (3), which authorize revocation of transitional leave if the person is found to have violated a rule of prohibited conduct after submission of a misconduct report and a hearing. *See* ER 44-49.

Wilson complained again to Fritz, describing his conversations with other prison officials and saying that he was "being punished for allegations that were proven" to be false and asking what prison regulation allowed him "to be held and punished for an alleged violation found to be not committed." ER 47. Fritz responded that Wilson had "access to the law library and OAR's." ER 47.

Fritz further declared that the facility in which Wilson was now being held did "not do transitional leaves." ER 47. Fritz now directed Wilson to appeal to a person named Jeff Hanson at another prison facility, who could verify the proper process for a return to transitional leave. ER 46-48.

At the same time, Wilson filed a hotline complaint and sent correspondence to Transitional Leave Assistant Director Martin. ER 44, 48. On August 18, 2010, Martin's assistant replied that "the Misconduct Report is a separate issue and process from the Alternative Incarceration Program's Transitional Leave. You have received the final word from Ginger Martin. This matter is now closed." ER 44. Martin's assistant did not address OAR 291-063-0036(2) and (3), which govern revocation of transitional leave. *See* ER 44.

A week later, having learned of Wilson's attempt to appeal to Jeff Hanson, as Wilson had been advised to do by Fritz, ER 46, 47, Martin's assistant wrote to Wilson again. ER 49. Speaking for Martin, the assistant told Wilson that he had "exhausted all . . . possible remedies with the department on this matter. Ms. Martin has the *final word* on Alternative Incarceration Program administrative reviews." ER 49 (emphasis added). Again, this communication did not include any reference to the regulations on revocation of transitional leave. *See* ER 49.

In this August 24, 2010, letter, Wilson was instructed that he had no hope of appealing Martin's denial of review: "Anyone in the department to whom you write about this matter will forward your inquiry to Ms. Martin's office because she has the authority and responsibility for these decisions . . . . [T]his matter is closed. Any further communications . . . will receive no response." ER 49.

On August 29, 2010, Wilson missed his son's fourth birthday, as he had missed the previous two birthdays. *See* ER 45-46.

### 7. Wilson Persisted in Inquiries as Other Prison Officials Expressed Confusion

As Wilson persisted in objecting to his continued confinement even after the misconduct charges had been dismissed, prison employee Pete Sturdevant emailed Kimberly Hendricks, the Hearings Administrator, on September 1, 2010. ER 37. Sturdevant said that he and others in the prison administration were puzzled about

why Wilson still remained in confinement after the dismissal of the charges at the hearing: "No violation was found . . . and the inmate is still living here at DRCI scratching his head along with some command staff around here wondering what went wrong." ER 37.

Behind the scenes, prison employees Denise Taylor and Heidi Steward and Parole Officer Johnson exchanged emails on September 2, 2010, about Johnson's sign-off on the note giving Wilson permission to "be out three nights a week with prior approval." ER 38. Officer Johnson now admitted "I remember this." ER 38. Although the hearing officer had observed that the signed permission expressly allowed Wilson to "stay where he wants . . . as long as he calls and leave[s] me a message," ER 36, Johnson insisted in this internal prison email that he meant only to give approval to stay at Wilson's girlfriend's and not elsewhere, ER 38. Johnson acknowledged he had signed the permission document when he was distracted with other people and said he "should have had [Wilson] come back to my office so I could have thought it through better." ER 38.

### 8. Re-Submitted Misconduct Charge is Dismissed, and Wilson Gives Notice of Intent to File a Habeas Petition

On October 25, 2010, Parole Officer Johnson initiated another misconduct report, reiterating the allegations contained in the previous report that Wilson had stayed at a place other than as approved and had frequented bars. ER 42.

On December 2, 2010, the re-submitted misconduct report was dismissed

after yet another disciplinary hearing. ER 42.[2] Once again, the accusation of

misconduct that had prompted the revocation of transitional leave and Wilson's

return to incarceration was rejected.

Earlier, on October 12, 2010, Wilson's attorney had written to Assistant

Director Martin warning that he had prepared a petition for habeas corpus. ER 41.

Attorney Roloff also stated that he had provided photographic and testimonial

evidence months earlier about the supposed "bar" visit and noncompliance with the

directions of a parole officer on residence — evidence that "clearly refuted the

initial allegations that caused Mr. Wilson to be terminated from his transitional

leave." ER 40. The lawyer observed that basic due process had not been

observed, as Wilson's rights to a hearing had been long neglected, the subsequent

---

[2]     Wilson's handwritten notation on the re-submitted misconduct report
dated October 25, 2010, is partially obscured on the court copy. ER 42. It reads:
"Dismissed Again on Dec. 2, 2010". ER 42. Under Oregon prison regulations,
when a misconduct report is submitted, a hearing must be conducted. OAR 291-
063-0036(3). Given that this case was dismissed at the pleading stage, Wilson did
not have an opportunity to conduct discovery and submit all documents that may
be pertinent on the merits. If necessary, on remand to the District Court, Wilson is
prepared to submit the order of dismissal from the second disciplinary hearing on
December 2, 2010, which is referred to in Wilson's notation on ER 42 as attached
to the verified complaint and which is in the possession of defendants.

hearing had dismissed the allegations, and yet the transitional leave matter continued to be "mishandled." ER 40.

After another dismissal of the charge of misconduct at the second disciplinary hearing, ER 42, Wilson mailed a "Writ of Habeas Corpus and Tort Claim" to the Solicitor General for the State of Oregon on December 7, 2010. ER 20. In the notice, Wilson stated that he had exhausted "all possible avenues of grievance and informal request[s] for relief" during his incarceration. ER 20.

### 9. Wilson Released from Prison

 On December 15, 2010, the Oregon Department of Corrections ordered that Wilson be immediately released from prison. ER 20.

Seven months after he had been returned to incarceration on a charge of misconduct, Wilson finally secured release from confinement. *See* ER 20. His release came a year earlier than the prison had told him to expect release, when Wilson had complained about his continued confinement after the charge of misconduct was dismissed at the first hearing. *See* ER 45.

The prison restored Wilson to leave less than two weeks after the re-submitted misconduct charge had again been dismissed at a disciplinary hearing, ER 42, and only eight days after Wilson had notified the State of his intent to seek habeas and tort relief, ER 20.

**B.   Section 1983 Proceedings**

**1.   Wilson Filed Section 1983 Civil Rights Suit**

As his first filing of any civil suit in a federal court, Wilson brought this constitutional civil rights action under 42 U.S.C. § 1983 in the United States District Court for the District of Oregon on November 21, 2012.  ER 19-50. Naming various officials of the Lane County Parole Office and the Oregon Department of Corrections, Wilson sought compensatory and other relief for unlawful confinement without due process between May 2010 and December 2010.  ER 20, 22, 24-26.

In particular, Wilson complained about the following due process violations:

(1)   revocation of his transitional release by false charges and the use of false evidence, ER 22;

(2)   failure to provide him with notice of the charge of misconduct and of his rights to a hearing, ER 23;

(3)   immediate return to confinement without a hearing, ER 22, 24;

(4)   persistent use of previously-refuted evidence to continue confinement and deny his return to transitional release, even after the first dismissal of the misconduct charge by the hearing officer, ER 25; and

(5)   the failure of supervisory personnel to prevent the continued denial of due process by parole and correctional officers, ER 25-26.

## 2. District Court Dismissed Action on Statute of Limitations Grounds

After a preliminary screening of the complaint pursuant to 28 U.S.C. § 1915A, the District Court dismissed Wilson's action before an answer was filed or discovery was permitted. *See* ER 13-17.

The District Court dismissed Wilson's first claim based on federal criminal statutes on the ground that "those criminal statutes do not create a private right of action for civil liability." ER 15. (We do not appeal the dismissal of this first claim in the complaint.)

The District Court agreed that the second and third constitutional claims were properly before the court under 42 U.S.C. § 1983. ER 15. However, the court dismissed the complaint as untimely under the Oregon two-year statute of limitations, which governs the timeliness of a § 1983 action. ER 15-16.

The District Court reasoned that "the plaintiff knew of his injury (the revocation of his transitional housing), no later than August 24, 2010," when a management assistant in the Oregon Department of Corrections informed him that he had exhausted all possible remedies. ER 16. Because the complaint was filed on November 21, 2012, which was more than two years later, the court dismissed the second and third claims as untimely. ER 16.

In support of dismissal on statute of limitations grounds, the District Court cited this Court's decision in *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005),

on the tolling of the statute of limitations during a prisoner's mandatory exhaustion of the prison administrative remedies under the Prison Litigation Reform Act. *See* ER 16. The District Court did not address the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), or this Court's decision in *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002), both of which address the accrual of a § 1983 civil rights action as depending on the availability of federal habeas relief when a prisoner remains in confinement or has been released on parole.

### 3. Appeal to This Court

On February 15, 2013, Wilson filed a timely notice of appeal from the final judgment through the prison mail system. ER 6-9. *See also* Statement on Jurisdiction, *supra*.

On May 8, 2014, this Court issued an order stating that "the appointment of pro bono counsel in this appeal would benefit the court's review." ER 4. This Court entered an Order appointing pro bono counsel to represent Wilson on appeal on August 26, 2014. ER 1-2. This replacement opening brief is submitted pursuant to the Court's Order.[3]

---

[3] This brief was prepared as part of the Ninth Circuit Pro Bono Program by faculty and students at the University of St. Thomas School of Law (Minnesota) and the University of Arkansas Robert A. Leflar Law Center.

# SUMMARY OF THE ARGUMENT

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that, before an incarcerated person may assert a civil rights action under 42 U.S.C. § 1983 that would necessarily undermine the lawfulness of imprisonment, he must first successfully challenge that imprisonment through a federal habeas corpus petition under 28 U.S.C. § 2254, which in turn must be preceded by exhaustion of state remedies. Accordingly, a § 1983 action does not accrue (and the statute of limitations clock does not begin to run) until after favorable termination of such state remedies or a federal habeas proceeding.

In this civil rights suit alleging unlawful confinement, Chet Michael Wilson attacks the validity of the revocation of transitional release in May 2010, his return to custody, and the extension of his confinement until December 2010. Wilson alleges he was denied due process by the revocation of release without a hearing and based on false accusations of disciplinary misconduct. ER 20-26. Because these claims go directly to the validity of his incarceration, Wilson's exclusive remedy while still confined on revocation of transitional leave was to pursue state remedies and thereby set the stage for a federal habeas petition. For these reasons, *Heck* and its progeny prevented the accrual of Wilson's § 1983 civil rights claim while he remained incarcerated and continued to challenge his confinement.

Wilson prevailed in his challenge to confinement through two disciplinary hearings that resulted in dismissal of the charges of misconduct that had prompted revocation of his transitional leave. ER 36, 42. He also provided notice to the state that he was preparing to file a habeas petition. ER 20. At that point, Wilson was granted immediate release from prison. ER 20.

Under the *Heck* favorable-termination rule, Wilson's § 1983 action accrued (and the statute of limitations clock began to run) upon his release. Wilson timely filed this § 1983 action within two years. ER 19-20.

Alternatively, in *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002), this Court held that a former prisoner who was released before favorable termination of state or federal habeas proceedings, which were then mooted because he was no longer confined, may pursue a § 1983 civil rights action alleging the unlawfulness of that earlier confinement. Because the conflict between the federal habeas statute and § 1983 disappeared after his release from prison, and because he had diligently pursued state administrative remedies during his confinement, Wilson may now proceed with his timely filed § 1983 action.

## ARGUMENT

This Court "review[s] *de novo* a district court's dismissal of a prisoner complaint under 28 U.S.C §1915A for failure to state a claim upon which relief can be granted." *Hamilton v. Brown*, 630 F.3d 889, 892 (9th Cir. 2011).

**I.    The District Court Erred in Dismissing Wilson's § 1983 Complaint as Untimely Under the Statute of Limitations Because *Heck v. Humphrey* Prevented the Accrual of Wilson's Civil Rights Claim During the Period of Continued Confinement**

Because Chet Michael Wilson alleges due process violations by parole and prison officials that resulted in the improper revocation of his transitional release and seven months of unlawful confinement, ER 22-26, his § 1983 civil rights claim did not accrue until his release from prison.  Under the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), a claim that "call[s] into question the lawfulness of the plaintiff's continuing confinement" does not begin to accrue until after the prisoner has obtained a favorable result through state remedies or a federal habeas corpus petition.  *Id.* at 483, 489-90.  Because Wilson's § 1983 suit was commenced within two years of the final dismissal of misconduct charges followed by his release from confinement, ER 19-20 — which by law under *Heck* was the earliest possible time for accrual — the District Court erred in dismissing his action as time-barred.

**A.** **Although Wilson's Lawsuit is Subject to Oregon's Two-Year Personal Injury Statute of Limitations, Federal Law Governs the Accrual of a § 1983 Action Challenging the Lawfulness of Confinement**

Section 1983 of Title 42 of the United States Code, enacted shortly after the Civil War, authorizes a federal cause of action against any person who, acting under color of state law, deprives another of rights secured by federal law or the United States Constitution. However, the Reconstruction-era Civil Rights Acts did not contain a specific statute of limitations for such actions. The Supreme Court has directed courts to borrow the forum state's personal injury statute of limitations, as most analogous, for Section 1983 claims. *Wilson v. Garcia*, 471 U.S. 261, 276-80 (1985).

The applicable statute of limitations for Wilson's § 1983 claim is Oregon's two-year statute of limitations for personal injury. Or. Rev. Stat. § 12.110(1); *Sain v. City of Bend*, 309 F.3d 1134, 1138 (9th Cir. 2002). However, "'[f]ederal law determines when a cause of action accrues and the statute of limitations begins to run for a § 1983 claim.'" *Rosales-Martinez v. Palmer*, 753 F.3d 890, 895 (9th Cir. 2014) (quoting *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991)); *see also Wallace v. Kato*, 549 U.S. 384, 388 (2007).

In this present case, the District Court applied the ordinary rule that a cause of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action," ER 16, citing the *Bagley* opinion decided three

years before the Supreme Court's decision in *Heck*.  However, as this Court

recently reiterated, a prisoner's civil rights claim for unlawful confinement does

not accrue until that confinement is overturned, which is "necessarily a later date

than when he learned" of the unlawful acts leading to that confinement.  *See*

*Rosales-Martinez*, 753 F.3d at 895 (involving a civil rights claim alleging an

unlawful sentence).

> **B.      Because Wilson's Allegations Undermine the Validity of His Renewed Confinement, *Heck v. Humphrey* Barred Accrual of the § 1983 Claim During the Period of Confinement**

> > **1.      *Heck v. Humphrey* Requires a Person Challenging the Lawfulness of Confinement to Obtain a Favorable Result Through State Remedies and Federal Habeas Before a § 1983 Claim Becomes Cognizable**

In *Heck v. Humphrey*, the Supreme Court addressed "the intersection of the

two most fertile sources of federal-court prisoner litigation — the Civil Rights Act

of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, and the federal habeas

corpus statute, 28 U.S.C. § 2254."  *Heck*, 512 U.S. at 480.  As the Court explained

in *Heck*, § 1983 allows civil rights suits for "unconstitutional treatment at the

hands of state officials," while generally not requiring any exhaustion of state

remedies.  *Heck*, 512 U.S. at 480.  By contrast, the federal habeas statute, § 2254,

"requires that state prisoners first seek redress in a state forum."  *Heck*, 512 U.S. at

480-81.  Ultimately, the *Heck* Court ruled that § 1983 may not be used to bypass

federal habeas with its requirement of prior resort to state remedies. Accordingly, a civil rights action for an allegedly unconstitutional conviction or sentence does not become cognizable until the plaintiff has obtained a favorable termination of state procedures or habeas, that is, "the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487.

In *Heck*, a state inmate brought suit under § 1983, alleging that several state prosecutors conducted an arbitrary investigation, knowingly destroyed exculpatory evidence, and employed an illegal voice identification procedure at trial, which resulted in his conviction for voluntary manslaughter. *Heck*, 512 U.S. at 478-79. During the pendency of the inmate's §1983 appeal, the state courts upheld his criminal conviction, and the federal courts rejected his habeas petitions. *Id.* at 479.

In its previous decision in *Preiser v. Rodriguez*, 411 U.S. 475 (1973), which involved a prisoner's challenge to the revocation of good-time credits, the Court had ruled "that habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983." *Heck*, 512 U.S. at 481 (describing *Preiser*). In *Heck*, even though the plaintiff sought money damages rather than "immediate or speedier release," the Supreme Court held that the exclusivity of the habeas remedy (with its requirement to

exhaust state remedies) extends to all § 1983 actions that "necessarily imply" the

lawfulness of a conviction or imprisonment.  *Id.* at 481, 487.

> **2.**  **The *Heck* Bar on § 1983 Accrual Extends to Claims Challenging the Validity of Prison Discipline That Extends the Duration of Confinement**

Subsequently, the Supreme Court clarified that *Heck* applies to § 1983 suits

alleging constitutional errors in post-conviction matters, such as early release and

prison disciplinary sanctions, when the allegations, if true, would "necessarily

demonstrate the invalidity of confinement or shorten its duration."  *See Wilkinson

v. Dotson*, 544 U.S. 74, 81-82 (2005).   Again, in such instances, the prisoner

instead must resort to state remedies before seeking habeas relief.

In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court extended

the *Heck* bar on § 1983 accrual to a claim requesting damages for deprivation of

good-time credits as a prison disciplinary sanction.  The plaintiff limited his

request for damages to the deprivation of good-time credits without due process,

while not seeking recovery for the loss of good-time credits "*undeservedly* as a

substantive matter."  *Id.* at 645.  In other words, the prisoner attempted "to draw a

distinction between challenges premised on the procedures utilized as opposed to

the ultimate outcome of the hearing."  *See Dible v. Scholl*, 410 F. Supp. 2d 807,

818 (N.D. Iowa 2006) (describing *Edwards v. Balisok*).   Nonetheless, the Supreme

Court held the claim not yet cognizable under § 1983, because the "principal

procedural defect complained of by respondent would, if established, necessarily imply the invalidity of the deprivation of his good-time credits." *Edwards*, 520 U.S. at 646.

In *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002), this Court confirmed that a prisoner's due process challenge to a prison disciplinary proceeding, which took away good-time credits and thus resulted in an extension of his confinement, falls within the scope of the *Heck* bar on a § 1983 claim. *Id.* at 874-75. Although this Court allowed the post-release lawsuit to proceed for reasons discussed further in Part II.B of this brief, the Court had no difficulty with the application of *Heck*:

> There is no question in this case that [the plaintiff] seeks damages for the unconstitutional deprivation of the good-time credits themselves, and that if he succeeded in showing that the prison officials acted contrary to *all* of the evidence, a finding in his favor would imply the invalidity of the revocation and administrative segregation. In that regard, [this] case parallels *Heck* and *Edwards.*

*Id.* at 875.

C.   **Because Wilson's Due Process Claims Directly Challenge the Validity of His Confinement and Revocation of Transitional Release, the *Heck* Bar Precluded Accrual of His Civil Rights Claim Until He Succeeded in Obtaining Release from Prison**

Wilson's claims of constitutional violations in the revocation of his release and his continued confinement fit squarely and comfortably within the Supreme Court's rulings in *Heck v. Humphrey* and *Edwards v. Balisok*, and this Court's ruling in *Nonnette v. Small*. Indeed, Wilson's due process claims do not merely

"imply" the invalidity of the confinement. Rather, he *expressly* challenges the lawfulness of that return to and continuation of incarceration. He forthrightly complains that he was "depriv[ed] . . . of [his] freedom of movement in a free society." ER 24. He contends state officials violated his rights "in an attempt to justify the reasoning for [his] imprisonment." ER 25. He asks for compensatory damages for his "illegal confinement between May 27th, 2010 through December 15th, 2010." ER 26. He identifies his request for relief as attributable to "illegal and false imprisonment." ER 26.

Moreover, the nature of the due process failures alleged in Wilson's complaint place the validity of the revocation of release and the continuation of confinement directly in issue. The revocation was accomplished without proper notice or a hearing. ER 23, 31. The arrest and return to custody were affirmed by a prison official who supposedly "corroborate[d] all of the allegations made in the parole officer's report," ER 34, but without any opportunity for Wilson to be heard. Wilson sought a hearing for the very purpose of overturning the charge of misconduct and thereafter being returned to release — requests that were evaded by prison officials. ER 23-24, 43.

A delayed disciplinary hearing resulted in dismissal of the charges because the evidence — including signed permission by the parole officer himself — contradicted accusations of misconduct. ER 36. After dismissal of the charges,

prison officials doubled-down, refused to return Wilson to release, told him that he had no hope for relief, and instructed him that no remedy was available. ER 45-49. Contradicting that statement by their later actions, parole and correctional officials resurrected the same charges that had previously been dismissed as unsupported by the evidence and were again dismissed at a later hearing. *See* ER 42.

Only after Wilson secured two administrative dismissals of the charge of misconduct, ER 36, 42, and gave notice that he would file a habeas petition, ER 20, did the prison relent and grant him immediate release, ER 20.

In sum, Wilson in his civil rights action is not only complaining about the procedures that were (or were not) applied to him, but also asserts that the very withdrawal of the early release and the resumption of confinement contradicted fundamental constitutional principles. Indeed, had his due process rights been upheld, he would have remained on transitional leave after May 27, 2010, *see* ER 23-24, 39, or would have been returned to release after a hearing absolved him of misconduct on August 5, 2010, *see* ER 36. Instead, Mr. Wilson remained incarcerated in an Oregon penitentiary until December 15, 2010 — nearly seven months from the date of his sudden arrest and four months after the charges against him were first dismissed by a hearing officer. ER 20.

This Court applied the *Heck* bar in a similar case in which a prisoner sought monetary damages under § 1983 for denial of parole, alleging that his due process

rights had been violated when the parole board considered false information in his prison file. *Butterfield v. Bail*, 120 F.3d 1023 (9th Cir. 1997). This Court found the prisoner's "civil claim for damages amount[ed] to a collateral attack on his denial of parole and subsequent incarceration" and thus could not proceed under *Heck*. *Id.* at 1024. Instead, the *Butterfield* Court explained, habeas was the proper avenue for a challenge to a parole eligibility proceeding in which employment of false evidence is alleged. *Id.* at 1025 (citing *Elliot v. United States*, 572 F.2d 238, 239 (9th Cir. 1978)). The prisoner's § 1983 claim would not accrue "unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of writ of habeas corpus." *Butterfield*, 120 F.3d at 1025.

Likewise, Wilson's allegations that his due process rights were violated when a parole officer propounded and prison officials repeated false charges to revoke early release is a direct assault upon the validity of his confinement from May to December 2010. Like *Butterfield*, his claim could not accrue "unless and until" he obtained a favorable termination and subsequent release.

### D. Alternatively, Because State Administrative Remedies Must be Exhausted Under the Prison Litigation Reform Act, the Statute of Limitations for Wilson's § 1983 Action was Tolled at Least Until the Dismissal of the Misconduct Charges at the Second Hearing

Chet Michael Wilson's § 1983 due process claims go directly and explicitly to the lawfulness of his confinement. These claims accordingly fell within the scope

of the *Heck* bar during Wilson's period of continued confinement. Even if the *Heck* bar had not applied, the two-year statute of limitations for the § 1983 claim would have been tolled for the duration of his confinement because of the need to exhaust prison remedies (which were not completed until December 2010).

As this Court recognized in *Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2005), in light of the administrative exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), when a prisoner brings a civil rights action "the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Brown*, 422 F.3d at 943.

In the present case, the District Court concluded that Wilson had exhausted the prison procedures by August 24, 2010, because an assistant in the Transitional Services Division "wrote plaintiff advising him that he had exhausted all possible remedies, that the matter is closed, and the department would respond to no further inquiries from plaintiff." ER 16. However, this assistant's statement that Wilson had "exhausted all of [his] possible remedies," ER 49, was incorrect; contradicted prison regulations requiring a hearing, OAR 291-063-0036(3); was contrary to what prison officials did afterward; and was apparently designed to discourage Wilson from continuing to insist on his rights under the prison regulations.

Far from being completed, administrative proceedings were resumed by the prison administration itself, when it re-submitted a charge of misconduct against

Wilson on October 25, 2010. ER 42. And, for that reason, the prison administrative process could not run its course until the re-submitted charge was dismissed at a second disciplinary hearing on December 2, 2010. ER 42.

As discussed further in Part II.B of this brief, a finding of misconduct at a hearing was required by Oregon regulations and by Supreme Court due process precedent before early release could be revoked. Thus, the prison administrative process could not reach a conclusion until Wilson was either found to have engaged in prohibited conduct or was exonerated. Indeed, after dismissal of the re-submitted charge at a hearing, ER 42, Wilson was ordered to be released immediately on December 15, 2010. ER 20.

Accordingly, the statute of limitations was tolled until at least December 2, 2010, when the prison remedy of a disciplinary hearing was again afforded to Wilson and all charges of misconduct were finally dismissed. More likely, the limitations period continued to be tolled until Wilson was released on December 15, 2010, because that release was the necessary remedy for the reversal of the charge of misconduct that had resulted in his return to confinement.

In either event, Wilson's § 1983 civil rights action filed on November 27, 2012, was timely filed within two years. *See* ER 19.

## II. Upon His Release From Prison After Diligently Challenging the Revocation of Transitional Release, Wilson's § 1983 Civil Rights Due Process Claim Became Cognizable and Now May Proceed

### A. Having Been Released From Prison After Successfully Obtaining Dismissal of Misconduct Charges, Wilson May Pursue His § 1983 Claim Under the Favorable-Termination Rule of *Heck*

Chet Michael Wilson's release from prison on December 15, 2010, ER 20, came in the immediate aftermath of the second dismissal of misconduct charges against him after another prison disciplinary hearing, ER 42, and his notice to the State of Oregon of his intent to file a habeas petition, ER 20. Having satisfied the favorable-termination rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), Wilson's § 1983 claim alleging due process violations in the revocation of his transitional release began to accrue upon his release from prison.

Under *Edwards v. Balisok*, 520 U.S. 641 (1997), a prisoner who will be held for a longer duration because he has been subject to prison discipline must exhaust state administrative or judicial remedies before filing a federal habeas corpus petition, rather than immediately filing a § 1983 action. *Id.* at 646-48. After succeeding in having the extended confinement "declared invalid by a state tribunal authorized to make such determination," the prisoner then may proceed to bring a § 1983 civil rights claim for damages. *See Heck*, 512 U.S. at 486-87.

Revocation of transitional leave under the Oregon "Alternative Incarceration Program" (AIP) is governed by regulation. While the suspension of a prisoner in

the AIP program may be a matter of prison administrative discretion while the person remains in custody, OAR 291-062-0150, a person who has already been released under that program may not be returned to incarceration without a finding of a violation after a hearing, OAR 291-063-0036. (Similarly, the revocation of parole in Oregon for an alleged violation of a condition of parole may occur only after a hearing to determine "whether there is probable cause to believe a violation of one or more of the conditions of parole has occurred." Or. Rev. Stat. § 144.343(1); *see also* OAR 255-075-0005(1) ("[B]efore the Board can revoke parole, . . . the Board or Hearings Officer shall conduct a hearing.").

Wilson's return to confinement was expressly justified by parole and prison officials as based on charges of misconduct by supposedly failing to comply with the rules for transitional leave. ER 23, 32, 39. Before later changing course after the charge had been dismissed, ER 44-47, the Assistant Director of Transitional Leave Services acknowledged that the revocation was based on allegations that Wilson had entered into an establishment where the primary source of revenue was alcohol and had failed to stay only in an approved residence, ER 34.

Under OAR 291-063-0036(2) and (3), when an inmate on transitional leave does not admit to a violation of conditions, the supervising officer must report the alleged violation in writing, which then will be submitted as a misconduct report and be reviewed at a hearing pursuant to the prison procedures for processing

disciplinary actions. At the hearing, if the "inmate [is] found in violation of a rule of prohibited conduct while he/she is on transitional leave," then he or she "may be subject to a revocation of leave and be returned to a Department of Corrections facility." OAR 291-063-0036(3).

The Oregon regulation requiring a hearing before revocation of transitional leave comports with the Supreme Court's mandate in *Young v. Harper*, 520 U.S. 143 (1997). While a prison has considerable discretion in determining when prisoners may participate in a rehabilitative program while still in custody, once a person has been released from prison and returned to the community to live in his own residence and maintain a job, he may not be returned to prison without satisfying due process protections. In *Young*, the Court held that, like someone on parole, a person granted early pre-parole release back into the community was in a "'condition . . . very different from that of confinement in a prison'" and thus has a protected due process interest in "his continued liberty.'" *Id.* at 147-48 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

Like an offender on parole, a person on early release from prison is not subject to a summary return to custody as a matter of administrative discretion. *Young*, 520 U.S. at 146, 150-52. Rather, that person is entitled to procedural protections to assure that any charge of a violation of the conditions of release is based on verified facts. *See Morrissey*, 408 U.S. at 484. Such minimum due

process standards include a preliminary hearing promptly conducted after arrest by an impartial hearing officer at which the person may be heard and present information, *id.* at 484-87, followed by a more formal hearing before a final decision of revocation, *id.* at 487-90.

In Wilson's case, a misconduct report was first submitted on June 23, 2010, accusing him of violating the conditions that he reside only where approved and that he not visit a tavern. ER 35. On August 5, 2010, the hearing officer dismissed the misconduct charge because the evidence submitted indicated that Wilson had received approval to stay elsewhere and the establishments he visited did not receive most of their revenue from the sale of alcohol. ER 36. On October 25, 2010, a misconduct report making nearly identical allegations was re-submitted. ER 42. After a second hearing, on December 2, 2010, the re-submitted misconduct report was dismissed. ER 42. On December 7, 2010, Wilson notified the state that he intended to file a habeas petition. ER 20. On December 15, 2010, the prison ordered Wilson's immediate release. ER 20.

In sum, the hearing officer as the authorized state tribunal to evaluate the charge of misconduct that prompted the return to confinement twice ruled in Wilson's favor and reversed the allegation of disciplinary wrongdoing. Without proof that Wilson had violated the conditions of his transitional leave, the prison had no authority to revoke his parole. *See* OAR 291-063-0036(3). Confirming

that Wilson had prevailed in his administrative challenge to the revocation of his transitional leave, the prison acted promptly to order his release afterward. ER 20.

Even aside from the clear directive of the hearing officer in twice dismissing the disciplinary charges, Wilson's immediate release from prison after notifying the state his intent to file a habeas petition was an implicit admission by authorized state officials that the revocation of Wilson's transitional leave had been invalid. Having satisfied *Heck*'s favorable-termination rule, Wilson was then free to pursue a civil rights claim, provided it was filed within two years of the date on which he had obtained the favorable result, that is, his release from prison.

### B. In the Alternative, Under *Nonnette v. Small*, Wilson May Now Pursue a § 1983 Civil Rights Claim Because His Release From Prison Mooted Any Petition for Habeas

Even if Wilson's release from prison had not been the result of a favorable termination of state remedies to challenge the revocation of transitional release, Wilson now may pursue his § 1983 claim for damages under the exception to *Heck*'s favorable-termination requirement recognized by this Court in *Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002). In *Nonnette*, this Court held that, where habeas corpus relief is unavailable due to mootness, "a § 1983 claim may be maintained." *Id.* at 876.

Once a prisoner has been released from prison, "the direct conflict between § 1983 and habeas corpus [addressed in *Heck*] is impossible because habeas is

unavailable." *See* Note, *Defining the Reach of* Heck v. Humphrey*: Should the Favorable Termination Rule Apply to Individuals Who Lack Access to Habeas Corpus?*, 121 Harv. L. Rev. 868, 881 (2008). As "no habeas remedy is available because a party is no longer in custody, permitting a § 1983 suit would not compromise the exhaustion requirement" under habeas. *Cole v. Doe 1*, 387 F. Supp. 2d 1084, 1093 (N.D. Cal. 2005).

In *Nonnette v. Small*, prison officials had revoked 360 days of an inmate's good-time credits at the conclusion of disciplinary hearings. *Nonnette*, 316 F.3d at 874. The inmate filed a § 1983 claim for damages stemming from the revocation, which was held by the district court to be barred under *Heck*. *Id.* Following the district court's decision, however, the inmate was released from prison on parole. *Id.* at 875. As a result, any habeas corpus petition by the parolee would have been dismissed as moot. *Id.* at 876 (citing *Spencer v. Kemna*, 523 U.S. 1 (1998)).

The issue thus presented in *Nonnette* was whether "the unavailability of a remedy in habeas corpus because of mootness permit[ted] [the parolee] to maintain a § 1983 action for damages, even though success in that action would imply the invalidity of the disciplinary proceeding that caused revocation of [the parolee's] good-time credits." *Id.* This Court answered the question in the affirmative for the released parolee. *Id*. at 876-77; *see also Silva v. Andemariam*, No. C13-1182-JLR, 2014 WL 294528 (W.D. Wash. 2014) (applying *Nonnette* to permit § 1983 suit by

parolee who challenged sufficiency of evidence relied on to find him guilty of violating the conditions of release, when he had already served the period of incarceration that was the sanction for the violation).

The *Nonette* Court adopted the approach of the so-called "*Spencer* Five" on the Supreme Court, that is, the four concurring Justices and one dissenting Justice in *Spencer v. Kemna*, 523 U.S. at 19 (Souter, J., concurring) ("*Heck* did not hold that a released prisoner . . . is out of court on a § 1983 claim, and for reasons explained in my *Heck* concurrence, it would be unsound to read either *Heck* or the habeas statute as requiring any such result."); *id.* at 25 n. 8 (Stevens, J., dissenting) ("Given the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear, as Justice Souter explains, that he may bring an action under 42 U.S.C. § 1983.").[4]

With this holding, the Ninth Circuit joined the Second and Seventh Circuits. *See Nonnette*, 316 F.3d at 876 ("[W]e join the Second and Seventh Circuits in concluding that, in these circumstances, a § 1983 claim may be maintained."); *Jenkins v. Haubert*, 179 F.3d 19, 21 (2d Cir. 1999); *Carr v. O'Leary*, 167 F.3d

---

[4] In *Nonnette*, 316 F.3d at 878 n.7, the Ninth Circuit emphasized that "our holding affects only former prisoners challenging loss of good-time credits, revocation of parole or similar matters; the status of prisoners challenging their underlying convictions or sentences does not change upon their release, because they continue to be able to petition for a writ of habeas corpus."

1124, 1127 (7th Cir. 1999).  Since *Nonnette* was decided, the Fourth, Sixth, and

Eleventh Circuits have also agreed that *Heck* does not bar a § 1983 claim for

damages where habeas relief is unavailable.  *See Wilson v. Johnson*, 535 F.3d 262,

267-68 (4th Cir. 2008); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501

F.3d 592, 603 (6th Cir. 2007); *Harden v. Pataki*, 320 F.3d 1289, 1299 (11th Cir.

2003).  By this approach, the courts "ensure[] that prisoners seeking redress from

constitutional violations will have a federal forum available to them."  *Dible v.*

*Scholl*, 410 F. Supp. 2d 807, 828 (N.D. Iowa 2006).

The Ninth Circuit clarified the holding of *Nonnette* in *Guerrero v. Gates*,

442 F.3d 697 (9th Cir. 2006).  The plaintiff there brought § 1983 claims alleging

excessive force, wrongful arrest, and malicious prosecution associated with his

arrest while on probation for narcotics charges.  *Id.* at 702.  The Court held that

*Heck* barred all but one of the plaintiff's § 1983 claims, despite the unavailability

of habeas relief due to the plaintiff's subsequent release, saying the plaintiff could

not "use his 'failure timely to pursue habeas remedies' as a shield against the

implications of *Heck*."  *Id.* at 705.  The Court distinguished *Nonnette* on the basis

that habeas corpus relief had been unavailable there due to the plaintiff's release

from prison and not to a failure to timely pursue appropriate remedies, as was the

case with the plaintiff in *Guerrero*.  *See id.*

Here, as in *Nonnette*, Wilson cannot obtain habeas corpus relief for the earlier revocation of his transitional release because his subsequent return to release mooted a habeas claim. Unlike *Guerrero*, where habeas relief was unavailable due to the plaintiff's failure to timely seek appropriate remedies, Wilson diligently sought relief following the revocation of his transitional release. Indeed, the defendants are estopped from arguing otherwise, given the declaration made to Wilson by Transitional Leave Services that he had "exhausted all . . . possible remedies with the department on this matter." ER 49.

As outlined in the "Statement of the Case" and discussed above in Part II.A of this brief, Wilson challenged the revocation of his transitional leave at every opportunity. Even when the prison administration instructed him to cease and desist, ER 49, he nonetheless pressed forward to a second hearing resulting in dismissal of the misconduct charge, ER 42, and to file notice of intent to petition for habeas, ER 20. In sum, Wilson remained a zealous advocate on his own behalf, even as prison officials repeatedly failed to provide proper notice of the charges against him and of his rights to respond, denied him a prompt hearing, refused to acknowledge the remedies available to him, renewed charges of misconduct previously dismissed as contradicted by evidence, and generally acted in violation of prison regulations. Indeed, his plan to take the next step and petition for habeas

relief was interrupted only by his success in obtaining an order of immediate release on December 15, 2010.  ER 20.

Wilson's case is thus a prime candidate for the *Nonnette* exception.  Prison officials who deprived Wilson of his constitutional due process rights should not be permitted to avoid a civil rights action by suddenly granting release and thereby mooting any further remedies.  As recognized by the Fourth Circuit, "[i]f a prisoner could not, as a practical matter, seek habeas relief, and after release, was prevented from filing a § 1983 claim, § 1983's purpose of providing litigants with a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nations would be severely imperiled."  *Wilson*, 535 F.3d at 268 (internal quotations and citations omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff-appellant Chet Michael Wilson asks this Court to reverse the District Court's judgment of dismissal and remand the case for further proceedings.

Date:  October 16, 2014                    Respectfully submitted,

UNIVERSITY OF ST. THOMAS
SCHOOL OF LAW
APPELLATE CLINIC

Lindsay C. Lien
Colin Seaborg
*Certified Law Student*
*Representatives*

/s/ Gregory C. Sisk
*Supervising Attorney*

UNIVERSITY OF ARKANSAS
FEDERAL APPELLATE
LITIGATION PROJECT

Thomas Christoph Keller
Britta Stamps
*Certified Law Student*
*Representatives*

Dustin E. Buehler
*Supervising Attorney*

Pro Bono Counsel for Plaintiff-Appellant Chet Michael Wilson

## STATEMENT OF RELATED CASES

Counsel for plaintiff-appellant Chet Michael Wilson are not aware of any related cases.

## CERTIFICATE OF COMPLIANCE WITH RULE 32 TYPE-VOLUME, TYPEFACE AND TYPE STYLE REQUIREMENTS

    1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,963 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii).

    2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using a proportionally spaced typeface in 14 point Times Roman.

Date:  October 16, 2014

s/
Gregory C. Sisk

## PROOF OF SERVICE

I, Gregory C. Sisk, hereby declare:  I am employed in Minneapolis, State of Minnesota.  I am over the age of 18 years, and not a party to the within action. My business address is University of St. Thomas School of Law, 1000 LaSalle Ave., MSL 400, Minneapolis, MN  55403-2015.

I hereby certify that on October 16, 2014, I electronically filed the following with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF System:

**REPLACEMENT OPENING BRIEF OF PLAINTIFF-APPELLANT**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on October 16, 2014 at Minneapolis, Minnesota.


/s/ Gregory C. Sisk

# Addendum

# ADDENDUM TABLE OF CONTENTS

CONSTITUTIONAL PROVISION ........................................... ADDENDUM — 1

    Amendment XIV, Section 1 ............................................. ADDENDUM — 1

STATUTES .................................................................................. ADDENDUM — 2

    Writ of Habeas Corpus, State Custody,
        28 U.S.C. § 2254(a) to (c) ....................................... ADDENDUM — 2

    Civil Rights Act, 42 U.S.C. § 1983 .................................. ADDENDUM — 3

    Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ........ ADDENDUM — 3

    Oregon Revised Statutes § 12.110(1) ............................... ADDENDUM — 3

OREGON ADMINISTRATIVE REGULATIONS ................... ADDENDUM — 4

    291-062-0100 ..................................................................... ADDENDUM — 4

    291-062-0110 ..................................................................... ADDENDUM — 4

    291-062-0120 ..................................................................... ADDENDUM — 5

    291-062-0150 ..................................................................... ADDENDUM — 6

    291-063-0036 ..................................................................... ADDENDUM — 8

    291-105-0021 ..................................................................... ADDENDUM — 9

## CONSTITUTIONAL PROVISION

### Amendment XIV, Section 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

# **STATUTES**

## **Writ of Habeas Corpus, State Custody, 28 U.S.C. § 2254(a) to (c)**

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

(b)

    (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

        (A) the applicant has exhausted the remedies available in the courts of the State; or

        (B)

            (i) there is an absence of available State corrective process; or

            (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

    (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

    (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

## Civil Rights Act, 42 U.S.C. § 1983

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)

(a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

## Oregon Revised Statutes § 12.110(1)

12.110. Assault, battery, false imprisonment, injuries to person or rights not arising on contract, fraud and deceit; forfeiture or penalty; overtime or premium pay; medical or dental malpractice; injuries arising from nuclear incident

 (1) An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit.

# OREGON ADMINISTRATIVE REGULATIONS

**291-062-0100**

**Authority, Purpose and Policy**

(1) Authority: The authority for these rules is granted to the Director of the Department of Corrections in accordance with 2003 Or Laws, Ch 464, 2008 Or Laws, Ch 35, ORS 179.040, 421.500 to 421.512, 423.020, 423.030 and 423.075.

(2) Purpose: The purpose of these rules is to establish special alternative incarceration programs and establish Department policy and procedures for the program's operation and management in accordance with ORS 421.500 to 421.512.

(3) Policy: Within the inherent limitations of resources, and the need to maintain facility security, internal order, and discipline, and the health and safety of staff, inmates, and the public, it is the policy of the Department of Corrections to discharge its statutory responsibilities to establish alternative incarceration programs by creating and operating programs that promote inmate rehabilitation during incarceration and reduce the risk of continuing criminal conduct when the inmate is returned to the community.

**291-062-0110**

**Definitions**

(1) Alternative Incarceration Program (AIP): A highly structured corrections program that includes intensive interventions, rigorous personal responsibility and accountability, physical labor, and service to the community.

(2) Custody Cycle: The time period during which an offender begins incarceration with the Department of Corrections and is under the supervision of community corrections until discharge from all Department of Corrections and community corrections incarceration and supervision.

(3) Other charges: Any criminal or civil accusatory instrument that alleges wrong doing and for which a person may be imprisoned or incarcerated.

(4) Short-Term Transitional Leave/Non-Prison Leave: A leave for a period not to exceed 90 days preceding an established release date that allows an inmate opportunity to secure appropriate transitional support when necessary for successful reintegration into the community. Short-term transitional leave/non-prison leave is granted in accordance with ORS 421.148, ORS 421.510 and the Department's rule on Short-Term Transitional Leave, Emergency Leaves and Supervised Trips (OAR 291-063). For purposes of these rules, short-term transitional leave is non-prison leave.

(5) Term of Incarceration: The period of commitment to the legal and physical custody of the Department imposed by a sentencing court in a judgment. For purposes of these administrative rules, "term of Incarceration" includes pre-sentence incarceration credit granted to an inmate by the Department under ORS 137.370(2)(a), as well as any time an inmate spends on short-term transitional/non-prison leave under 421.510.


## 291-062-0120

### General

(1) The Department of Corrections has established and operates two types of alternative incarceration programs.

(a) One of the alternative incarceration programs is an intensive cognitive program and the other is an intensive addictions program that includes intensive addiction intervention and treatment.

(b) Each alternative incarceration program is a minimum of 270 days duration and includes two components — a structured institution program and a period of structured short-term transitional leave.

(c) Each alternative incarceration program will require its participants to engage in a minimum of 14 hours per day of highly structured routine seven days per week for the duration of the program.

(2) Inmates are required to participate in and successfully complete transition classes offered as a condition of program graduation. The number and frequency of these classes will be determined by each facility.

(3) Short-Term Transitional Leave: The Department in its discretion may grant individual inmates a period of structured, short-term transitional leave as part of their alternative incarceration program assignment if:

(a) The inmate has identified viable self-support options in the community: or

(b) The supervising community corrections agency has approved a temporary subsidy that will allow the inmate to successfully transition in the community.

(c) All expenses must be borne by the inmate unless otherwise specifically authorized.

      \*      \*      \*


**291-062-0150**

**Removal or Suspension From an Alternative Incarceration Program**

(1) The functional unit manager or designee in his/her discretion may remove or suspend an inmate from any portion of an alternative incarceration program, and may reassign the inmate to another Department of Corrections facility to serve the balance of the inmate's court-imposed incarceration term(s), for administrative or disciplinary reasons. The decision to remove or suspend an inmate from the program will be made in consultation with a committee appointed by the functional unit manager or designee that is responsible to review the performance of inmates participating in an alternative incarceration program.

(2) Administrative Removal/Suspension:

(a) The functional unit manager or designee in his/her discretion may immediately remove or suspend an inmate from the program and reassign the inmate to another Department of Corrections facility without a hearing, for administrative reasons.

(b) An inmate who is not available to participate substantially in the program (e.g., physical and mental illness, court appearance(s), disciplinary segregation, etc.) for up to 30 days following placement will have his/her program participation suspended and be evaluated by the committee to determine whether the inmate will be removed from the program or accepted back into the program at the program level deemed appropriate by the functional unit manager or designee.

(c) Any change in status that would cause an inmate to be ineligible to continue participating in the program as described in OAR 291-062-0130 (e.g., discovery of a detainer), may result in a suspension.

(A) If suspended, the inmate will have 30 days to resolve his/her eligibility status with the Department. If the inmate's eligibility status remains unresolved, the inmate will be removed from the program.

(B) An extension may be made by the functional unit manager or designee on a case-by-case basis.

(d) If other charges will result in immediate incarceration upon release to short-term transitional leave, the inmate will have 30 days to resolve his/her eligibility status with the Department. If the inmate's eligibility status remains unresolved, the inmate will be removed from the program. An extension may be made by the functional unit manager or designee on a case-by-case basis.

(e) Inmates are expected to participate in all aspects of their program assignment at a level consistent with the length of time they have been assigned to the program.

(A) The functional unit manager or designee in his/her discretion may suspend an inmate from the program for 30 days or more when, in consultation with the program performance review committee, the functional unit manager or designee determines that the inmate is not making adequate program progress. During the suspension, the inmate will be given an opportunity to come into compliance with established program standards.

(B) If the inmate comes into compliance, he/she will be placed at a program level deemed appropriate by the functional unit manager or designee. If the inmate fails to meet program expectations, he/she may be removed from the program. If the inmate is assigned to an intensive alternative incarceration addiction program, the inmate may have the length of his/her program extended beyond 270 days.

(3) Disciplinary Removal/Suspension: An inmate who after a hearing in accordance with procedures provided in the Department's rule on Prohibited Inmate Conduct and Processing Disciplinary Actions (OAR 291-105) is found to have committed a major disciplinary rule violation may be removed from the program and transferred to another Department of Corrections facility at the discretion of the functional unit manager or designee.

(4) Voluntary Removal: An inmate may elect to remove himself/herself from an alternative incarceration program; however, to do so the inmate must sign a document requesting removal from the program to the functional unit manager or designee. Voluntary removal from the program constitutes a program failure.

(5) Once an inmate has been removed from an alternative incarceration program as a program failure or completes the program and returns to prison on another crime, he/she will be ineligible to participate in another alternative incarceration program during the same custody cycle. If the failure is from an alternative incarceration addictions program, he/she will be ineligible to participate in any other alcohol and

drug treatment program during the same custody cycle (this does not include dual diagnosis programs).

(6) Administrative Review of Removal for Program Failure:

(a) When the functional unit manager or designee removes an inmate from the inmate's program assignment for a program failure, the inmate will be notified in writing of the reason(s) for the removal decision, and the opportunity for administrative review of the decision.

(b) To obtain an administrative review of the removal decision, an inmate must send a request for administrative review in writing to the Assistant Director for Transitional Services or designee, together with any supporting documentation. The Assistant Director for Transitional Services or designee must receive the request within 15 calendar days of the date of the notice of the administrative removal.

(c) The review should be completed within 15 days after receiving an inmate's review request. The Assistant Director for Transitional Services or designee's decision on administrative review shall be final.

\*      \*      \*


**291-063-0036**

**Violations of Short Term Transitional Leaves**

(1) Sanctions may be imposed at the local level if:

(a) The supervising officer determines that the violation can appropriately be addressed; and

(b) The inmate admits the violation and accepts the sanction.

(2) A Misconduct Report shall be submitted any time a violation of short-term transitional leave may result in revocation of that leave. In such instances it shall be the responsibility of the supervising officer to report the alleged violation in writing to the releasing authority within 5 working days of the infraction. The releasing authority shall ensure that a misconduct report is submitted in accordance with the department's rule on Prohibited Inmate Conduct and Processing Disciplinary Actions (OAR 291-105)

(3) When a misconduct report is submitted, a hearing shall be conducted in accordance with the Department of Corrections rule on Prohibited Inmate Conduct and Processing Disciplinary Actions (OAR 291-105). An inmate found in violation of a rule of prohibited conduct while he/she is on transitional leave, may be subject to a revocation of the leave and be returned to a Department of Corrections facility (291-105-0069(1)(e)) and may be subject to other sanctions in accordance with the Department of Corrections rule on Prohibited Inmate Conduct and Processing Disciplinary Actions (OAR 291-105).

*    *    *

<strong>Procedures for Disciplinary Action</strong>

**291-105-0021**

**Procedures for Handling Misconduct by Inmates**

*    *    *

(2) Misconduct Reports:

(a) When the misconduct justifies submission of a misconduct report, the DOC or OCE employee shall file a misconduct report with an immediate supervisor or the officer in charge no later than 24 hours AFTER sufficient evidence is gathered, discovered, or observed to support a charge of violation of rules. Determination of the sufficiency of evidence shall be a matter of judgment for the employee submitting the report and the immediate supervisor reviewing the report.

(b) The reviewing supervisor will ensure the report is accurate, appropriate and supported by sufficient information. The supervisor will then sign the report. The reviewing supervisor or designee shall be responsible for providing the inmate with a copy of the misconduct report, rules of prohibited conduct, and the notice of hearing and inmate rights within 24 hours of the filing of the report unless the inmate is unavailable to be served.

(c) The hearing may be held within 24 hours with the inmate's consent.

(d) The misconduct report shall be submitted on a Department of Corrections form, and shall be as specific and comprehensive as possible.

(A) The misconduct report shall include a description of any unusual relevant inmate behavior and information regarding how the employee became aware of the behavior. The misconduct report must contain sufficient and complete facts to

support the alleged rule violation(s), including a description of what the restitution is for and the amount of restitution to be ordered, if it is possible to determine.

(B) Attempt and Conspiracy: If an inmate attempts or conspires to commit an act of prohibited conduct, it shall be considered the same as if the inmate had completed the act.

(e) The misconduct report must specifically allege all the major or minor rule violations the inmate is alleged to have violated, and demonstrate conduct constituting an attempt or conspiracy. Neither the hearings officer nor the adjudicator may add or change any violations. The hearings officer may find the inmate in violation of lesser included violations.

(f) Reports from DOC or OCE employee witnesses shall also be submitted.

(g) When the alleged misconduct occurs while the inmate is in the temporary physical custody of a jurisdiction other than the Department of Corrections, employees from that jurisdiction may provide a written description of the misconduct to Department employees.

(A) On review of such written information, the officer-in-charge at the facility receiving the inmate back into the physical custody of the Department may determine that the described action violates a rule(s) of prohibited inmate conduct and direct that a misconduct report be submitted.

(B) The written description provided by the temporary custody jurisdiction shall accompany the misconduct report. A misconduct report shall not be submitted absent a written description of the allegation from the temporary physical custody jurisdiction.

(C) If it is determined that the other jurisdiction maintained the inmate in a similarly restrictive status, the inmate shall be credited with the number of days he/she was held in segregation type status by the other jurisdiction.

(3) Temporary Placement in Disciplinary Segregation Status: An inmate charged with committing a rule violation may be placed in temporary disciplinary segregation status pending resolution of the charge. This action will be taken when the functional unit manager or the officer in-charge determines that the alleged rule violation charged is of such seriousness that the good order and security of the facility requires immediate removal of the inmate from the general population, or it is determined the inmate is a threat to the community or is likely to escape or abscond.

(a) If temporary disciplinary segregation status is ordered, the officer in charge must complete the portion of the Department of Corrections misconduct report specifying the reason(s) why immediate temporary disciplinary segregation of the inmate was deemed necessary.

(b) A completed copy of the Department of Corrections misconduct report will be forwarded to the functional unit manager or designee who will review the inmate's pre hearing detention status within 72 hours of the inmate's placement in temporary disciplinary segregation status. If approved, the functional unit manager or designee will initial the report. If the inmate is temporarily confined in a local jail while on short term transitional leave or emergency leave, the functional unit manager or designee will be notified for review of the inmate's status, within 72 hours of the inmate's confinement.

(4) Scheduling a Hearing:

(a) An inmate charged with a rule violation shall be scheduled for a hearing as soon as practicable.

(5) Initiating a Hearing:

(a) A hearing shall be initiated within ten calendar days (including Saturdays, Sundays, and legal holidays) if the inmate is placed in temporary segregation status.

(b) All other hearings shall be initiated as soon as practicable. For significant delays, reasons for longer timeframes shall be made part of the hearing record.

(c) When an inmate charged with a level I or level II rule violation is released from custody prior to a hearing being held, a hearing will be initiated as soon as practicable upon his/her return to DOC custody.

(d) The hearing may be postponed or continued for a reasonable period for good cause as provided in OAR 291-105-0064. The reason(s) for the postponement or continuance shall be made part of the record.